NATIONAL LABOR RELATIONS BOARD
v. MONTGOMERY WARD & CO.

MONTGOMERY WARD & CO. v. NATIONAL LABOR RELATIONS BOARD.
No. 10108.

Circuit Court of Appeals, Ninth Circuit.
Feb. 15, 1943.

Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Gerhard P. Van Arkel, Asst. Gen. Counsel, and Morris P. Glushien, Owsley Vose, John H. Garver and Maurice J. Nicoson, all of Washington, D. C., for National Labor Relations Board.

Stuart S. Ball, of Chicago, Ill., for Montgomery Ward & Co.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

GARRECHT, Circuit Judge.

Montgomery Ward & Company, herein referred to as "Wards", is an Illinois corporation, having its principal offices in Chicago, Illinois. At the time of the Labor Board hearing it operated, in its business of selling merchandise at retail, nine mail order houses, 650 retail stores, and 206 mail order sales units, in various cities and towns in the United States. In Portland, Oregon, Wards operated a mail order house and a retail store. Approximately ninety per cent. of the merchandise distributed by the Portland establishments was shipped to Portland from states outside the state of Oregon; about 60 per cent. of the customers of the Portland mail order house live outside of the state of Oregon, and a substantial part of the goods distributed by said house are shipped out of the state of Oregon. A small portion of the goods sold by the retail store is shipped or delivered outside the state of Oregon. At the time of hearing (or prior to the strike then in progress) Wards employed about 1200 persons in the mail order house and 175 persons in the retail store. The mail order house and the retail store each had a separate local manager.

The powers of the National Labor Relations Board were called upon by separate charges filed with the Board by two unions, which alleged that Montgomery Ward & Co. was engaging in unfair labor practices within the meaning of the National Labor Relations Act (of July 5, 1935, 49 Stat. 449–457, 29 U.S.C.A. § 151, et seq.) The two unions were the Warehousemen's Union, Local No. 206, of Portland, Oregon, and the Retail Clerks' International Protective Association, Local No. 1257, also of Portland, both affiliated with the American Federation of Labor. A third union, the Office Employees Union No. 16821, also of the city of Portland and an American Federation of Labor affiliate, was rather indirectly concerned, although it was not named in the "charges" filed. This union had notified Wards that the Retail Clerks' union was empowered to bargain for it, and negotiations between Wards and the Retail Clerks proceeded on that basis.

Each of the "charges" filed with the Board alleged that Wards refused to negotiate or bargain in good faith with the named union despite the fact that the Warehousemen had been certified as the collective bargaining union for all warehouse employees of Wards, that Clerks represented "an overwhelming majority of the retail clerks employed" by Wards. By an order of the Board, dated March 28, 1941, the two charges were consolidated

for further proceedings before it. Subsequently, on March 31, 1941, the Board issued its complaint against Montgomery Ward & Co., as respondent, reciting that charges of unfair labor practices had been preferred by the above two unions, alleging the classification of the employees going to make up the two bargaining units and that Warehousemen and Clerks were the respective bargaining representatives. The complaint then went on to allege that Wards had "refused to bargain collectively in good faith" with the two named unions; that as a result thereof the unions did, on or about December 7, 1940, call a strike against, and establish picket lines about the premises of, respondent; that the strike had continued in existence since that time to the date of issuance of the complaint; that by refusing to bargain in good faith with, and in its refusal to submit counter proposals to, the unions, Wards thereby engaged in unfair labor practices within the meaning of the Act; that by the refusal to bargain and other acts, Wards interfered with, restrained, and coerced its employees in the exercise of their rights to organize and bargain collectively through representatives of their own choosing, etc.; that Wards' activities in this regard have a relation to interstate commerce, and have led to, and tend to lead to, a burden thereon or obstruction thereof. In conclusion the complaint alleged that the acts therein recited constituted unfair labor practices affecting commerce within the meaning of Section 8(1) and 8(5) and Section 2(6) and 2(7) of the said Labor Relations Act. Notice of hearing issued on the same day as the complaint, and thereafter Wards filed its answer. In the answer, Wards denied all the essential allegations of the complaint, and alleged that the picket lines were established solely because of its refusal to agree to a "union shop" or "closed shop" clause proposed by the unions. A hearing was had in Portland, Oregon, which produced a rather lengthy transcript of record. Following the hearing, the trial examiner presented an intermediate report in favor of the unions and against Wards, and, thereafter, Wards filed exceptions to said report and a brief in support of its position. An oral argument was then presented to the Board by its and Wards' counsel. Later, the Board filed its findings and conclusions in the form of an opinion.

All issues were resolved in favor of the unions and against Wards, and the latter was ordered to cease and desist from "Re-fusing to bargain collectively with" the unions and also to cease and desist from in "any other manner interfering with, restraining, or coercing its employees in the exercise of the right of self-organization, * * * to bargain collectively", etc. The order also required Wards to take affirmative action in the matter of reinstatement and making whole for loss of pay those employees who went on strike on December 7, 1940, or thereafter, and to bargain collectively with the unions with respect to rates of pay, wages, hours, and other conditions of employment, and to post notices that it will cease and desist from the proscribed conduct.

The Board petitions this court for enforcement of its order against Wards, and the latter cross-petitions "for review and to set aside" the said order.

In the consideration of the problem here before us two issues are presented, namely, (1) whether Wards was guilty of refusing to bargain collectively in good faith and (2) whether Wards was guilty of coercion subsequent to the calling of the strike on December 7, 1940. The latter problem is the simpler and we shall dispose of it first.

### Coercion.

■ On this question there is a substantial disagreement on the facts; the Board's witnesses testified to facts which would give rise to an inference that Wards, subsequent to the calling of the strike on December 7, 1940, attempted, by means of threats, to coerce certain employees to return to their work; Wards' witnesses denied that such tactics were used. After a careful study of the evidence in the record on this question we are impelled to observe that the testimony for both sides is, to say the least, unsatisfactory. The Board chose to believe its own witnesses; and this being one of its prerogatives under the law ("The findings of the Board as to the facts, if supported by evidence, shall be conclusive." § 10(c) L.R.Act), we must proceed on that understanding.

On this question, the Board found that on Sunday, December 8, 1940, the day following the commencement of the strike at Portland, one Robinson, who was superintendent of operations of Wards' mail order house there, called together the operating superintendents of each floor, handed each a list of names and telephone numbers of employees who worked under them, and instructed the superintendents to con-

vey to the employees a message. The message, and the written instructions thereon, read as follows:

"Since you were not at work today I wanted to let you know that we are operating tomorrow as usual and your job is open for you if you want to come in.

"(When you have made the above statement listen for the employee's reaction to it. Do not make any further statement unless the employee asks some question. It is not possible to set out all the possible questions which you may be asked, but in answering the questions you should confine yourself to a repetition of the thought contained in the quotation above. When questions are asked, you may answer them frankly, but above all, do not in any way insist that the employee should come to work or intimate that their jobs will be in danger. The main purpose of this call is to notify the employee that the plant is operating and his job is waiting for him if he wants to come in.)"

It was further found by the Board that Wards' supervisory employees, following instructions, transmitted this message to the listed employees, but that one McGowan went beyond his instructions. It appears from such findings that three employees testified respecting McGowan's activities. One of them, Blackburn, a woman, said she called McGowan by telephone to advise him that she had not been to work on the first day of the strike because she did not want to cross the picket line. This woman testified that McGowan told her it was not necessary that she cross the picket line, but that she could enter the premises by the back way; she also said he told her to advise her fellow employees that if they were not present on Monday morning they would be replaced. One Fullerton stated that during the week following the commencement of the strike McGowan and his wife called at Fullerton's home and that McGowan told the witness he was making a friendly call and advising those whom he could trust that if they did not return by a certain date their jobs would be refilled. Board witness Hough said that McGowan visited his home at a time when he was absent and that on repaying the call, he was advised by McGowan that if he wanted to return to work he could avoid going through the picket line by using the back entrance to the store, and that the store would never "go union." McGowan positively denied being a party to any such conversations after December 6th and denied making any coercive statements to either Fullerton or Hough. One Long, who had remained away from his work at Wards from the commencement of the strike until December 17th, when he resumed his employment, was present at McGowan's home on the evening of the Hough visit, and corroborated McGowan's testimony in this particular. The Board, as well as its trial examiner, credited the testimony of Blackburn, Fullerton, and Hough over that of McGowan and Long.

We inquire, first, whether a message such as that quoted above is within the definition of Section 8(1); and, secondly, if not whether McGowan's going beyond his instructions may be attributed to his employer so as to constitute an 8(1) violation.

■ It is to be noted that the strike was in progress when the supervisory employees delivered Wards' message to the absent employees. It will be observed, also, that the message, quoted above, was not coercive or threatening in its terms, but may easily have been taken to have the subtle suggestion for McGowan to do what he did. The vice is to be found in the interference by Wards with its employees' right "to bargain collectively through representatives of their own choosing," guaranteed by Section 7 of the Act, 29 U.S.C.A. § 157. This attempt to deal individually with the employees at a time when a strike was in progress, apparently the result of unproductive efforts in collective bargaining, is within the prohibition of Section 8(1) of the Act, 29 U.S.C.A. § 158(1). By attempting to deal with the individual employees, Wards, in this instance, ignored and disregarded the employees' chosen representatives, selected for the purpose of collective bargaining, and thereby engaged in an unfair labor practice. We quote a sentence from National Labor Relations Board v. Acme Air Appliance Co., 2 Cir., 117 F.2d 417, 420: "To permit the employer to go behind the chosen bargaining agent and negotiate with the employes individually, or with their committees, in spite of the fact that they had not revoked the agent's authority, would result in nothing but disarrangement of the mechanism for negotiation created by the Act, disparagement of the services of the union, whether good or bad, and acute, if not endless, friction, which it is the avowed purpose of the Act to avoid or mitigate." See, also, by way of analogy, N.L.R.B. v. Remington Rand, Inc., 2 Cir.,

94 F.2d 862, 870, where it is said: "But it is plain, we think, that after an exclusive bargaining unit has taken a strike vote, it is an active interference with the exercise of its right to 'bargain collectively' for the employer to undercut its authority by a vote of his own. The only possible reason for doing this is to show that the union's vote does not truly represent the men's wishes; it is to go over the heads of the representatives to their constituents; to discredit them as representatives, to destroy their power to bargain as such." An additional authority is N.L.R.B. v. Lightner Pub. Corp., 7 Cir., 113 F.2d 621, 625.

■■ No more, of course, need be said to uphold enforcement of that portion of the Board's order respecting interference, restraint, and coercion. There is, however, an additional reason for enforcing this part of the order, and that is the finding of the Board respecting McGowan's activities in attempting to induce certain employees, referred to above, to return to work.

It does not appear in the Board's findings that McGowan had the power to "hire and fire" employees for Wards, nor are we able to find any evidence to that effect, but this is not an essential factor in fixing responsibility upon Wards for McGowan's conduct. N.L.R.B. v. Link-Belt Co., 311 U.S. 584, 599, 61 S.Ct. 358, 85 L.Ed. 368; Internat'l Ass'n of Machinists, etc., v. N.L.R.B., 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. 50. Assuming, as we must, that the Board's findings reflect the true facts respecting McGowan's solicitation of employees Blackburn, Hough, and Fullerton, and that McGowan actually said the things attributed to him by these employees (we do not mean to impute anything sinister in McGowan's conduct; it was not mala in se, but, rather, forbidden under current interpretations of the Act), Wards is responsible for his words and his conduct toward these employees, irrespective of the fact that McGowan had been instructed "not in any way to insist that the employee should come to work or intimate that their jobs will be in danger." As was said in Internat'l Ass'n of Machinists v. N.L.R.B., supra, at page 80 of 311 U.S. at page 88 of 61 S.Ct., 85 L.Ed. 50: " * * * We are dealing here not with private rights [case cited] nor with technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants, but with a clear legislative policy to free the collective bargaining process from all taint of an employer's compulsion, domination, or influence. The existence of that interference must be determined by careful scrutiny of all the factors, often subtle, which restrain the employees' choice and for which the employer may fairly be said to be responsible. * * *"

■ In N.L.R.B. v. Link-Belt Co., supra, at page 599 of 311 U.S. at page 366 of 61 S.Ct., 85 L.Ed. 368, the Supreme Court again voiced the same thought: " * * * As we indicated in International Association of Machinists v. National Labor Relations Board, supra, the strict rules of respondeat superior are not applicable to such a situation. If the words or deeds of the supervisory employees, taken in their setting, were reasonably likely to have restrained the employees' choice and if the employer may fairly be said to have been responsible for them, they are a proper basis for the conclusion that the employer did interfere. * * *"

The following cases also support the position we have taken: N.L.R.B. v. Biles Coleman L. Co., 9 Cir. 98 F.2d 16, 18, 22; N.L.R.B. v. Sunshine Min. Co., 9 Cir., 110 F.2d 780, 786, 792; N.L.R.B. v. Lightner Pub. Corp., 7 Cir., 113 F.2d 621, 625; Oughton et al. v. N.L.R.B., 3 Cir., 118 F. 2d 486, 498; N.L.R.B. v. New Era Die Co., 3 Cir., 118 F.2d 500, 503; N.L.R.B. v Clarksburg Pub. Co., 4 Cir., 120 F.2d 976, 979; N.L.R.B. v. Moench Tanning Co., Inc., 2 Cir., 121 F.2d 951, 953. There are some decisions contra (as, for example, N. L.R.B. v. Whittier Mills Co., 5 Cir., 111 F. 2d 474, 479; E. I. du Pont de Nemours & Co. v. N.L.R.B., 4 Cir., 116 F.2d 388, 400; and Wilson & Co. v. N.L.R.B., 7 Cir., 120 F.2d 913, 919), but we are not persuaded thereby, both because of factual differences and of what we consider the inherent justice of the situation under the act.

### Refusal to Bargain.

Clerks began organizing Wards' retail employees in February or March, 1940, and by August 6 of that year claimed a majority of Wards' retail clerks, which claim apparently was accepted by Wards, and is not disputed. The Warehousemen was certified by the Board, on August 10, 1940, as the proper and exclusive bargaining representative of the unit of Wards' warehouse employees. Wards, through its West coast labor representative, W. B. Powell (assisted at times by the manager of the Portland retail store and the manager of the mail order house), engaged in bargaining con-

ferences with Clerks on September 19, and October 22, 1940; with Warehousemen on November 12, 1940; and in a joint conference with both Clerks and Warehousemen on November 25, 1940. Subsequent to the commencement of the strike further conferences were conducted for the avowed purpose of negotiating agreements. Prior to the first conferences each union submitted to Wards a proposed written contract. No stenographic transcript was taken of the discussions at the conferences, due to objection by Wards, but there is no substantial conflict in the testimony respecting what transpired at these meetings. In advancing a reason for his objection thereto Wards' representative suggested that the taking of a stenographic transcript would impair the flexibility of the discussions. At no time did Wards offer in writing any proposed contracts to which it would agree, or offer any written counter proposals. Wards' representative took the position that Wards was seeking nothing from the unions and that the unions were obliged to submit to it contracts with which it would agree.

In general outline, the conferences proceeded with a reading of the unions' proposed contracts, article by article or section by section, to which Wards' representative would reply and state the company's position or objection. On some occasions the union representative would comment respecting the objections, but on others, the article or section was simply passed and the next article or section read. The unions did not present or propose new written contracts following the conferences, but at such meeting presented the contracts originally proposed, notwithstanding knowledge of the company's objection to certain sections.

The Board found "that on September 19, 1940, and at all times thereafter, [Wards] has refused to bargain with the Retail Clerks and the Warehousemen as the exclusive representatives of its employees in appropriate units with respect to rates of pay, wages, hours of employment, and other conditions of employment, and that the respondent has thereby interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act." The Board held that there had been "a refusal to bargain" and that Wards was guilty of an "unfair labor practice," under Section 8 of the Act.

Pertinent excerpts of Section 7 and Section 8 of the Labor Relations Act, 49 Stat. 452, 29 U.S.C.A. §§ 157, 158, are printed in the margin.[1]

Since the only remaining question to be decided is whether or not Wards was guilty of a refusal to bargain collectively with the representatives of its employees, it is necessary to determine the meaning of the term "refusal to bargain." The Act itself contains no precise definition of the term. Looking to the cases for enlightenment, we find that the phrase "collective bargaining" has been considered by many courts and uniformly interpreted. Wilson & Co., Inc., v. N.L.R.B., 8 Cir., 115 F.2d 759, 763, contains an excellent and well-documented discussion on the subject of "collective bargaining." We quote:

"The petitioner relies heavily upon the language of Chief Justice Hughes in the case of National Labor Relations Board v. Jones & Laughlin Steel Corp., hereinbefore quoted [301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R.1352], to the effect that the act does not compel agreements between employers and employees and does

---

[1] Sec. 7. "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

Sec. 8. "It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 [Sec. 7] of this title.

* * * * *

"(5) To refuse to bargain collectively with the representatives of his employees,

subject to the provisions of section 159(a) of this title."

The Section 159(a) referred to is part of Section 9 of the Act, and provides, in part, that:

"(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: Provided, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer."

not compel any agreement whatever. That language, of course, sustains petitioner's contention that it could not be compelled to enter into any written agreement which incorporated provisions unacceptable to it; but the language does not sustain petitioner's contention that bare collective bargaining, without any willingness on its part to reduce understandings reached to writing, constitutes the kind of bargaining which the law requires. Obviously, the purpose of the act is to require collective bargaining to the end that contracts satisfactory to both employer and employees may be reached. [Cases cited.] The act does not specifically require that the results of collective bargaining be reduced to writing, but a refusal to do what reasonable and fair-minded men are ordinarily willing to do, upon request, may certainly be taken to be an indication of a lack of proper intent and good faith in collective bargaining.
* * *

"Without attempting complete accuracy, we think that the applicable rules of law are, in substance, as follows: While the act does not compel that employer and employees shall agree, it contemplates that agreements will be reached as the result of collective bargaining. [Cases cited.] It obligates the employer to bargain in good faith both collectively and exclusively with the chosen representative of a majority of his employees with respect to all matters which affect his employees as a class, including wages, hours of employment, and working conditions. [Cases cited.] It does not, however, prohibit individual employees or groups of employees from negotiating with the employer concerning grievances. [Cases cited.] The employer is not required to take the initiative in seeking a contract with his employees or with their chosen representative, nor is he required to enter into negotiations with third parties not representing his employees. [Cases cited.] When an employer has reached an agreement with his employees, he is under the further duty of bargaining collectively before making changes in existing contracts. [Cases cited.] The requirements which are imposed by the act upon the employer can only be satisfied by an honest and sincere compliance. [Cases cited.] When collective bargaining results in agreement, a good-faith compliance with the law requires that the agreement be reduced to writing, unless both parties desire that it remain oral, or unless some

other justifiable ground exists for not putting it in writing. [Cases cited.]"

■■ Another decision of like tenor is National Labor Relations Board v. Boss Mfg. Co., 7 Cir., 118 F.2d 187, 189, which states: "Collective bargaining, as contemplated by the Act, is a procedure looking toward the making of a collective agreement between the employer and the accredited representative of his employees concerning wages, hours and other conditions of employment. Collective bargaining requires that the parties involved deal with each other with an open and fair mind and sincerely endeavor to overcome obstacles or difficulties existing between the employer and the employees to the end that employment relations may be stabilized and obstruction to the free flow of commerce prevented. [Cases cited.] Mere pretended bargaining will not suffice [Cases cited.], neither must the mind be hermetically sealed against the thought of entering into an agreement. [Case cited.] To do less than is required by the decisions above cited is a refusal to bargain collectively and violates the spirit and tenor of the Act. [Case cited.]"

See, also, N.L.R.B. v. Knoxville Pub. Co., 6 Cir., 124 F.2d 875, 881; N.L.R.B. v. Somerset Shoe Co., 1 Cir., 111 F.2d 681, 688; N.L.R.B. v. Griswold Mfg. Co., 3 Cir., 106 F.2d 713, 723; Globe Cotton Mills v. N.L.R.B., 5 Cir., 103 F.2d 91, 94. It is not necessary to encumber this opinion with further citations in like vein, the quoted cases, and those cited, being amply supported by many other authoritative pronouncements of the courts.

The Board found that "Pursuant to its hypertechnical approach, the respondent [Wards] was willing to meet with the Unions when requested, listen to their demands, and explain its position thereon. Further than this the respondent refused to go * * *." The Board also found that Wards adhered to the view that "the obligation of taking further steps rested upon the Unions alone" and that Wards "was opposed to submitting to the Unions genuine counter-proposals."

There were four major obstacles upon which the conferences reached an impasse: (1) Union or closed shop; (2) increased wages; (3) seniority; and (4) arbitration. In the contract proposed by each union there was a clause which provided, substantially, that the company either would give preference of employment to unem-

ployed union members, or that if non-members were employed they must make application within a specified time for membership in the particular union. Each of the proposed contracts contained a section relative to seniority—that is, that in slack seasons or in the event of lack of work, layoffs and re-hiring should be on the basis of seniority, those with the greater length of service should be laid off later than those with lesser periods of service and that re-hiring should be made in the inverse order. Also, each of the proposed contracts made provision for wage increases applicable to the various classifications of employees within the several bargaining units. In addition, the contracts proposed by each of the three unions provided for arbitration of disputes by a "Board of Adjustment," which would have the power to decide questions respecting the meaning or enforcement of the proposed agreement and to settle disputes arising out of discharge of an employee where such employee alleges the discharge to be unjust, and to settle disputes on other questions concerning the contracts.

Wards and the unions also disagreed upon other matters contained in the proposed contracts. Wards refused to agree to the inclusion of exclusive-recognition and non-discrimination clauses in the "binding" parts of the proposed agreements. The company based its refusal upon the ground that neither of these questions was a bargaining matter—that both questions were controlled by the Act, 29 U.S.C.A. §§ 158 and 159—but offered to include recognition as a preliminary "whereas" clause in the agreement.

None of the "bargainers" exhibited any intention to, nor did any of them, recede from the original position taken, until December 13, 14, and 16, 1940, at meetings presided over by one Ashe, a conciliator of the United States Department of Labor, when the unions appeared to waver. At the December 13 conference, counsel for the unions asked Powell, Wards' representative, whether Wards would be willing to arbitrate "the question of what clauses should be included in the contract" if the unions should withdraw their request for a "union shop." The reply was in the negative. The unions then made further proposals for arbitration and concluded with a request to Powell that the company take up the proposed contracts, section by section, and write them out and delete from, and add to, the proposed sections as it desired.

Powell replied that it was up to the unions to make proposals which would please the company; that the company had no affirmative duty to do anything. On the following day Wards' representative was asked if the company would be willing to sign an agreement which merely set out its present policies and practices. Powell replied that the question of the form of the agreement—verbal or written—was premature at the time; that if an agreement could be reached upon substantial provisions, that question should then be considered. In answer to a question whether Wards would sign an agreement Powell replied that discussion on the question was premature. Obviously, the primary question asked Powell remained unanswered. Neither did Wards change its attitude on the occasion of the last meeting, December 16, 1940; it took the same position as always upon the principal points of dispute.

We think we may say that no contention is made that the facts found do not conform to the evidence. After carefully reviewing all the testimony in the record, we are satisfied that facts found are in accordance therewith. This seems to be agreed: The dispute is as to the inferences which may be drawn from these facts. The Board drew the inference that Wards by its conduct during the course of the conferences and negotiations demonstrated a want of good faith and was, therefore, guilty of a refusal to bargain collectively, as required so to do by the National Labor Relations Act.

The Supreme Court, in N.L.R.B. v. Columbian Co., 306 U.S. 292, 299, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660, defined the limits of our authority under Section 10(e) of the Act, 29 U.S.C.A. § 160 (e), upon consideration of a petition for enforcement of an order of the Board, as follows: "Section 10(e) of the Act provides: ' * * * The findings of the Board as to the facts, if supported by evidence, shall be conclusive'. But as has often been pointed out, this, as in the case of other findings by administrative bodies, means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred. [Cases cited.] Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'

[Case cited], and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. [Cases cited.]"

 Another decision of the Supreme Court, N.L.R.B. v. Waterman S. S. Co., 309 U.S. 206, 208, 60 S.Ct. 493, 495, 84 L.Ed. 704, states the rule thus: "In that [Labor Relations] Act, Congress provided, 'The findings of the Board as to the facts, if supported by evidence, shall be conclusive.' It is of paramount importance that courts not encroach upon this exclusive power of the Board if effect is to be given the intention of Congress to apply an orderly, informed and specialized procedure to the complex, administrative problems arising in the solution of industrial disputes. As it did in setting up other administrative bodies, Congress has left questions of law which arise before the Board—but not more—ultimately to the traditional review of the judiciary. Not by accident, but in line with a general policy, Congress has deemed it wise to entrust the finding of facts to these specialized agencies. * * *"

See N.L.R.B. v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307. This court may not pass on the credibility of witnesses nor the weight or sufficiency of the testimony. N.L.R.B. v. Reed & Prince Mfg. Co., 1 Cir., 118 F.2d 874, 879.

 Wards argue that "The duty to bargain collectively is no less nor more than the duty to recognize the authority of the employee representative, to participate in such discussion as is necessary to avoid mutual misunderstanding, and to enter into binding agreements on such terms, if any, as are mutually acceptable." Unquestionably, Wards recognized the unions as bargaining agents for its employees, and it did meet with them, listen to their demands, and explain its position thereon. But no agreement was entered into by Wards, and nothing in the nature of a binding contract was put in writing by Wards, nor was any document purporting to be a binding agreement signed by it. We think, also, that Wards' understanding of the connotation of the phrase "duty to bargain collectively" is acceptable, insofar as it goes, but that it is incomplete. As we view the statute, it is the obligation of the parties to participate actively in the deliberations so as to indicate a present intention to find a basis for agreement, and a sincere effort must be made to reach a common ground. As was said in N.L.R.B. v. Reed & Prince Mfg. Co., 1 Cir., 118 F.2d 874, 885: "The respondent, following the beginning of the strike, was legally bound to confer and negotiate sincerely with the representatives of its employees. It was required to do so with an open mind and a sincere desire to reach an agreement in a spirit of amity and cooperation. The cases setting forth this obligation are many, and it is well settled that a mere formal pretence at collective bargaining with a completely closed mind and without this spirit of co-operation and good faith is not a fulfillment of this duty. [Cases cited.]"

As illustrative of the attitude with which Wards approached and conducted the bargaining conferences, and from which, among other factors, the Board might have inferred that Wards exhibited a want of good faith, we shall briefly refer to a few matters which arose out of the conferences.

 It appears from the findings of the Board that Wards never, at any time in the course of the negotiations, directly promised to sign a written contract, although its representative was asked on several occasions whether or not he would do so. Always the reply was that the question was "premature," that it had best be answered when agreement was reached. Considering as immaterial the fact that the "parties had not yet reached complete understanding," the Board concluded that this type of answer "was tantamount to a refusal to bargain altogether." Certainly, the answer was evasive and not calculated to reveal whether or not the Company would sign an agreement if any was reached, and may well have had a discouraging influence. The significance of the answer becomes apparent when we consider that the Supreme Court's decision in H. J. Heinz Co. v. N.L.R.B., 311 U.S. 514, 526, 61 S.Ct. 320, 85 L.Ed. 309—which settled once and for all that it is a "refusal to bargain" to decline to sign an agreement entered into—was not filed until some weeks after the negotiations here had broken down. We believe the Board was entitled to consider the failure of Wards to state that it would put into writing any contract to which it might agree as a pertinent circumstance on the issue of refusal to bargain. Hartsell Mills Co. v. N.L.R.B., 4 Cir., 111 F.2d 291, 292.

The Board regarded as an additional factor in a design to refuse to bargain the ac-

tion of Wards' representative respecting a provision of the proposed contracts. The proposed contracts contained provisions that if the employees were worked in excess of five hours without a meal period, the excess time should be paid for at the overtime rate. Wards' representative insisted that the word "five" be changed to "six" to conform to existing practice. The record reveals, however, that he had been advised by his superior at the home office that "under normal conditions an employee should not be worked more than five consecutive hours without a meal period." Not even Wards doubted the reasonableness of such a demand; nevertheless Powell, its representative, stood firm. No court in the land could hold that the Board was not justified in drawing an inference unfavorable to Wards from its conduct respecting this provision. A reasonable man might conclude that it refused to agree to this provision because it had no intention of entering into a contract, or of binding itself at all.

The McGowan activity, discussed heretofore, was also regarded by the Board as a pertinent circumstance tending to show the Company's lack of good faith in conducting negotiations.

A further circumstance which supports the Board in drawing the inference that Wards was "stalling," arose out of the conference of November 25, between Wards and Warehousemen. At this meeting Estabrook, secretary for Warehousemen, suggested that he would fly to Chicago for a conference with Barr, Powell's superior, in an effort to induce Wards to change its policy respecting "union shop." Powell's report of this discussion is contained in his letter of November 26, addressed to Barr, and which reads in part as follows: "* * * Mr. Estabrook then suggested he would be glad to fly to Chicago to talk with you, if there were some possibility that our policy could be changed. At first they insisted we give them a reply within twenty-four hours, but later agreed to allow us until noon on Thursday, November 28. *I will wait until Thursday morning at which time I will call Mr. White.* [a union representative] in San Francisco and explain that you will be glad to meet with union representatives in Chicago and listen to their argument, * * *." (Emphasis supplied.)

From this it appears that Powell *knew* on the 25th, or, at the latest, the 26th, what his answer was going to be, and deliberately refrained from informing White until the 28th—and this in face of the union's desire for an immediate answer. Unquestionably the Board was privileged to draw from these delaying tactics an inference unfavorable to Wards' "good faith" in the negotiations.

The Board, in reviewing the various acts of Wards as a non-performance or mis-performance of its duty to bargain, appears to attach especial significance to the refusal of Wards to submit counterproposals to the unions at any time during the course of the negotiations. Wards was not bound to offer a counterproposal (N.L.R.B. v. Express Pub. Co., 5 Cir., 111 F.2d 588, 589), but when one is asked for, it ought to be made, although not indispensable (Globe Cotton Mills v. N.L.R.B., 5 Cir., 103 F.2d 91, 94). A counterproposal would, no doubt, have put Wards' willingness to bargain beyond question, and in the absence thereof the Board may not be condemned for drawing the opposite conclusion. While the Act places upon the employees the burden of instituting the bargaining proceedings and no burden in this respect upon the employer, it is not incumbent upon the employees continually to present new contracts until ultimately one meets the approval of the company. M. H. Ritzwoller Co. v. N.L.R.B., 7 Cir., 114 F.2d 432, 436.

The incidents just discussed, while, perhaps, not controlling in and of themselves, in cumulative effect give impetus and decisiveness to the Board's conclusions. They are simply manifestations of an attitude—intent, if you will—persisted in by Wards, a negative attitude which amounted to, in its result, a refusal to bargain. In its brief, Wards says, "The duty [to bargain] is to do nothing or say nothing which would make agreement on those terms [mutually acceptable] impossible." This is not a carrying of the burden of the duty to bargain, for, in effect, it means to do nothing or say nothing to make agreement possible. Throughout the conferences there is apparent a studied design of aloofness, of disinterestedness, of unwillingness to go forward, upon the part of Wards, which found its answer in the Board's conclusion of refusal to bargain.

Wards' conduct throughout the conferences was an all too literal adherence to the rule formulated by itself as a fulfillment of the duty to bargain collectively: "to

participate in such discussion as is necessary to avoid mutual misunderstanding." To do this and nothing more is to fall far short of the accomplishment of the statutory duty to bargain collectively, because the affirmative efforts of both parties are required—there must be, in a real sense, active cooperation. The cases, supra, defining "collective bargaining" sustain this view. See, also, N.L.R.B. v. George P. Pilling & Son Co., 3 Cir., 119 F.2d 32, 37. In Singer Mfg. Co. v. N.L.R.B., 7 Cir., 119 F.2d 131, 134, the court said: "* * * The greatest of rascals may solemnly affirm his honesty of purpose; that does not foreclose a jury from finding from the evidence submitted that he possesses no trace of such innocent quality. We think the Board had full authority to determine as a fact whether petitioner was acting in good faith or whether its actions amounted to a mere superficial pretense at bargaining,—whether it had actually the intent to bargain, sincerely and earnestly,—whether the negotiations were captious and accompanied by an active purpose and intent to defeat or obstruct real bargaining. [Cases cited.]"

We have, in our discussion, purposely refrained from commenting upon the four major points of the proposed contracts because we believe these questions must be discussed in future negotiations and we desire to leave the parties free to meet them without undue restriction. Moreover, although there was, in addition to the Board's petition for enforcement of its order, a petition by Wards to set aside the order, we have considered both petitions together.

The order of the Board will be enforced.