NATIONAL LABOR RELATIONS BOARD
v. REGISTER PUB. CO., Limited.

No. 10364.

Circuit Court of Appeals, Ninth Circuit.

Feb. 28, 1944.

Rehearing Denied April 10, 1944.

Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, and William J. Isaacson and William T. Whitsett, Attys., N. L. R. B., all of Washington, D. C., and Maurice J. Nicoson, Regional Atty., N. L. R. B., of Los Angeles, Cal., for petitioner.

O'Melveny & Myers, Homer I. Mitchell, John Whyte, and Willis Sargent, all of Los Angeles, Cal., for respondent.

Before WILBUR, MATHEWS, and STEPHENS, Circuit Judges.

MATHEWS, Circuit Judge.

Respondent, Register Publishing Company, Limited, a California corporation, was at all pertinent times engaged in the business of publishing a daily newspaper called the Santa Ana Register in Santa Ana, California. On April 30, 1941, and at all pertinent times prior thereto, a majority of respondent's employees [1] were members of Santa Ana International Typographical Union No. 579, a labor organization, hereafter called the union. For purposes of collective bargaining, the union was at all pertinent times the representative of all the employees. On March 27, 1942, the union filed with the National Labor Relations Board charges to the effect that on March 1, 1940, and at all times thereafter, respondent had engaged in the unfair labor practices hereafter mentioned. On April 23, 1942, the Board issued a complaint, stating the charges, and caused the complaint to be served on respondent. Respondent answered, a hearing was had, and on October 7, 1942, the Board stated its findings and conclusions.

The Board found that respondent had refused to bargain collectively with the union as the representative of its employees and had discharged and refused to reinstate 18 employees [2] who were members of the union, and that these acts tended to lead to labor disputes burdening and obstructing interstate commerce.

The Board concluded that by refusing to bargan collectively with the union as the representative of its employees, respondent had engaged in an unfair labor practice listed in § 8(5) of the National Labor Relations Act, 29 U.S.C.A. § 158 (5); that by discharging and refusing to reinstate 18 employees who were members of the union, respondent had discriminated against them in regard to hire and tenure of employment, had thereby discouraged membership in the union and had thereby engaged in an unfair labor practice listed in § 8(3) of the Act, 29 U.S.C.A. § 158(3); that by refusing to bargain collectively with the union as the representative of its employees and by discharging and refusing to reinstate 18 employees who were members of the union, respondent had interfered with, restrained and coerced its employees in the exercise of rights guaranteed in § 7 of the Act, 29 U.S.C.A. § 157, and had thereby engaged in an unfair labor practice listed in § 8(1) of the Act,

---

[1] Employees referred to in this opinion are those whom respondent employed in the composing room of its publishing plant in Santa Ana, California. Those employed elsewhere are disregarded, as this proceeding does not relate to them.

[2] A. L. Berkland, F. L. Berkland, C. W. Brakeman, William O. Bray, C. J. Bronzen, Charles Clayton, G. W. Duke, E. W. Ellis, W. H. Fields, G. L. Hawk, J. W. Jones, L. C. McKee, J. W. Parkinson, J. H. Patison, J. A. Sherwood, V. C. Shidler, J. E. Swanger and E. Y. Taylor.

29 U.S.C.A. § 158(1); and that all the practices so engaged in were unfair labor practices affecting commerce within the meaning of §§ 2 and 10 of the Act, 29 U.S.C.A. §§ 152, 160.

Accordingly, on October 7, 1942, the Board issued and caused to be served on respondent an order requiring it to cease and desist from all these practices and to take certain affirmative action.[3] On February 9, 1943, the Board petitioned this court for enforcement of the order. Answering the petition, respondent prays that the order be set aside on the ground that the findings are not supported by evidence.

First. Does the evidence support the finding that respondent refused to bargain collectively with the union as the representative of its employees? ·

The evidence shows that respondent bargained collectively with the union in 1937, 1939, 1940 and 1941; that the 1937 bargaining resulted in an agreement with respect to rates of pay, wages, hours and other conditions of employment of respondent's employees for a period of two years ending March 1, 1939; that the 1939 bargaining resulted in an agreement renewing and extending the 1937 agreement for a period of one year ending March 1, 1940; that the 1940 bargaining occurred in March, April and May, 1940; that the 1941 bargaining occurred in April, 1941; and that no agreement resulted from the 1940 bargaining or from the 1941 bargaining.

The complaint in this case charged that respondent had refused to bargain collectively with the union as the representative of its employees on and after March 1, 1940. It did not charge any prior refusal. Our present inquiry, therefore, is

---

[3] The order requires respondent to—
"1. Cease and desist from:

"(a) Discouraging membership in [the union] or any other labor organization of its employees by discharging, refusing to reinstate, or in any other manner discriminating in regard to hire and tenure of employment or any term or condition of employment of any of its employees;

"(b) Refusing to bargain collectively with [the union] as the exclusive representative of all employees in the composing room of the respondent's Santa Ana plant;

"(c) In any other manner interfering with, restraining, or coercing its employees in the exercise of the right of self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purposes of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the National Labor Relations Act [29 U.S.C.A. § 157].

"2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

"(a) Upon request, bargain collectively with [the union] as the exclusive representative of all the employees in the composing room of the respondent's Santa Ana plant in respect to rates of pay, wages, hours of employment, and other conditions of employment;

"(b) Offer to the employees listed in Appendix A [the 18 employees mentioned above] immediate and full reinstatement to their former or substantially equivalent positions without prejudice to their seniority and other rights and privileges, * * * placing those employees for whom no employment is immediately available upon a preferential list * * * and thereafter offering them employment as it becomes available;

"(c) Make whole the employees listed in Appendix A for any loss of pay they may have suffered by reason of respondent's discrimination against them by payment to each of them of a sum of money equal to that which he normally would have earned as wages from August 2, 1941, to the date of the offer of reinstatement, or placement on a preferential list, less his net earnings during said period;

"(d) Post immediately in conspicuous places at its Santa Ana plant and maintain for a period of at least sixty (60) consecutive days from the date of posting, notices to its employees stating (1) that the respondent will not engage in the conduct from which it is ordered to cease and desist in paragraphs 1(a), (b), and (c) of this order; (2) that the respondent will take the affirmative action set forth in paragraphs 2(a), (b) and (c) of this order; and (3) that its employees are free to become or remain members of [the union], and the respondent will not discriminate against any employees because of membership or activity in that organization;

"(e) Notify the [Board's] Regional Director for the Twenty-first Region in writing within ten (10) days from the date of this order what steps the respondent has taken to comply herewith."

limited to what occurred in and after March, 1940. As to that, the evidence shows:

Although, by its terms, the 1937 agreement, as renewed and extended in 1939, expired on March 1, 1940, the parties continued to observe that agreement until April 30, 1941. Under that agreement, journeymen printers employed by respondent [4] were paid $1 an hour for a workweek of 5 days of 7½ hours each, with time and a half for overtime,[5] but were not paid for any time spent on vacation. Apprentices were paid less than journeymen,[6] but respondent was permitted to employ only three apprentices and was not permitted to exercise full control over them, they being under the union's "jurisdiction."[7] The agreement provided for a closed shop; that is to say, it required respondent to employ none but members or apprentices of the union.

In March, 1940, the union proposed to respondent that they make an agreement under which respondent's journeymen printers would be paid $1.15 an hour for a workweek of 5 days of 7½ hours each, with time and a half for overtime and one week's vacation annually with pay. Respondent rejected that proposal.

Thereafter, in March, 1940, respondent proposed to the union that they make an agreement under which some of respondent's journeymen printers [8] would be paid $1 an hour and others [9] 75 cents an hour for a workweek of 6 days—5 days of 7 hours each and one day of 5 hours—with time and a half for overtime, but none would be paid for time spent on vacation, and respondent would have full control of its apprentices[10] and could operate its plant as an open shop. The union rejected that proposal.

In April, 1940, the union proposed to respondent that one of the several questions about which they were in disagreement, namely, the question of wages, be submitted to arbitration. Respondent rejected that proposal.

Thereafter, in April, 1940, the union proposed to respondent that they make an agreement under which all journeymen printers employed by respondent would be paid $1.06 an hour for a workweek of 5 days of 7½ hours each, with time and a half for overtime and one week's vacation annually with pay. Respondent rejected that proposal.

In May, 1940, the union proposed to respondent that they make an agreement under which all journeymen printers employed by respondent would be paid, for a workweek of 5 days of 7½ hours each, $1.03 an hour until September 1, 1940, $1.04 an hour from September 1, 1940, to March 1, 1941, $1.05 an hour from March 1, 1941, to September 1, 1941, $1.06 an hour from September 1, 1941, to March 1, 1942, and $1.08 an hour from March 1, 1942, to March 1, 1943, with time and a half for overtime and vacation pay as follows: Two days in 1940, 3 days in 1941, 5 days in 1942 and 5 days in 1943. Respondent rejected that proposal.

On April 15, 1941, the union sent respondent a letter reading, in part, as follows: "The [union] has instructed its scale committee to offer you the following proposition as a fair and equitable basis for adjusting the differences that exist between it and the Santa Ana Register;[11] One dollar and seven cents ($1.07) until

---

[4] Respondent's employees included (1) journeymen printers and (2) apprentices.

[5] Meaning $1.50 an hour for all hours over 7½ worked on any day of the 5-day workweek and all hours worked on other days.

[6] Apprentices were paid, in their second year, 40% of journeymen's wages; in their third year, 50%; in their fourth year, 60%; in their fifth and sixth years, or until they possessed journeymen's cards (issued by the union), 80%. What pay, if any, they received in their first year does not appear.

[7] Apprentices were not permitted to operate linotype machines, although admittedly capable of doing so, until the sixth year of their apprenticeship.

[8] The ones who were qualified to set up any kind of matter and to do any work necessary to be done in a composing room. Such printers are called combination operators.

[9] The ones who were qualified only to set up straight editorial matter. Such printers are called straight matter operators.

[10] Specifically, respondent proposed that apprentices be permitted to operate linotype machines before the sixth year of their apprenticeship.

[11] Respondent's newspaper's name, "Santa Ana Register," was sometimes applied to respondent itself.

October 1, then one dollar and twelve cents ($1.12) per hour until March 31st, 1942." [12] That, obviously, was intended as a proposal that respondent and the union make an agreement under which all journeymen printers employed by respondent would be paid, for a workweek of 5 days of 7½ hours each, $1.07 an hour until October 1, 1941, and $1.12 an hour from October 1, 1941, to March 21, 1942, with time and a half for overtime. Respondent rejected that proposal.

On April 26, 1941, respondent sent the union a letter reading as follows: "In accordance with our recent negotiations, the board of directors of [respondent] have authorized me[13] to place this proposition before you in writing. Namely, we are willing to allow our printers to work forty (40) hours a week,[14] instead of 37½, at the same rate of pay they are now getting of $1 an hour. This will give them a weekly increase of $2.50, or approximately $130 a year. Also, we are to have complete control of the number and work of our apprentices, as we see fit for efficient operation of our plant." [15] That, obviously, was intended as a proposal that respondent and the union make an agreement under which all journeymen printers employed by respondent would be paid $1 an hour for a workweek of 40 hours, with

time and a half for overtime, and respondent could have as many apprentices as it wished and would have complete control of their work. The union rejected that proposal.

■ If the evidence showed only the foregoing facts, it would not support the finding that respondent refused to bargain collectively with the union as the representative of its employees; for, although required to bargain with the union, respondent was not required to accept any of the union's aforesaid proposals, nor was it prohibited from making either of its aforesaid proposals to the union.

■■ But, in addition to the foregoing facts, the evidence shows that in April, 1940, in May, 1940, and in April, 1941, the union[16] requested that any agreement which might result from the bargaining between respondent and the union be reduced to writing and signed by both parties. The evidence further shows that, to each of these requests, respondent[17] replied that it would not sign any agreement with the union. By so refusing to sign any agreement, respondent, in effect, refused to bargain collectively with the union as the representative of its employees;[18] and this is true despite the fact that, at the time of the refusal, no agreement had been reached.[19] We conclude that the evidence

12 Vacation pay was not mentioned in the letter, nor, so far as the evidence shows, was it ever mentioned by either party after the rejection of the union's May, 1940, proposal.

13 C. H. Hoiles, who, at all pertinent times, was respondent's secretary-treasurer and business manager. Hoiles represented respondent in negotiations with the union and was a witness for respondent in this case.

14 The number of days in the 40-hour workweek proposed in the letter was not indicated.

15 The question of a closed or open shop was not mentioned in the letter, nor, so far as the evidence shows, was it ever mentioned by either party after the rejection of respondent's March, 1940, proposal.

16 By G. W. Duke and S. R. Brown. Duke was the union's vice president in April and May, 1940, and was its president in April, 1940. Brown was a "special representative" of the union. He and Duke represented the union in negotiations with respondent and were witnesses for the Board in this case.

17 By C. H. Hoiles. See footnote 13.

18 H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 523–526, 61 S.Ct. 320, 75 L.Ed. 309; National Labor Relations Board v. Sunshine Mining Co., 9 Cir., 110 F.2d 780, 787, 788; National Labor Relations Board v. Montgomery Ward & Co., 9 Cir., 133 F.2d 676, 684, 146 A.L.R. 1045; Globe Cotton Mills v. National Labor Relations Board, 5 Cir., 103 F.2d 91, 94; Art Metals Construction Co. v. National Labor Relations Board, 2 Cir., 110 F.2d 148, 150; National Labor Relations Board v. Highland Park Mfg. Co., 4 Cir., 110 F.2d 632, 637–639; Continental Oil Co. v. National Labor Relations Board, 10 Cir., 113 F.2d 473, 480, 481; Bethlehem Shipbuilding Corp. v. National Labor Relations Board, 1 Cir., 114 F.2d 930, 941; Wilson & Co. v. National Labor Relations Board, 8 Cir., 115 F.2d 759, 764; National Labor Relations Board v. Blanton Co., 8 Cir., 121 F.2d 564, 569, 571; National Labor Relations Board v. Knoxville Publishing Co., 6 Cir., 124 F.2d 875, 882.

19 National Labor Relations Board v. Sunshine Mining Co., supra; National Labor Relations Board v. Montgomery Ward & Co., supra; Art Metals Con-

supports the finding that respondent did so refuse to bargain.

Second. Does the evidence support the finding that respondent discharged and refused to reinstate the 18 employees [20] mentioned above?

There is no evidence that respondent discharged any of the 18 employees mentioned. Instead, the evidence shows that on April 30, 1941, the union called a strike of respondent's employees, and that the 18 employees mentioned responded to the call and immediately, on April 30, 1941, went out on strike, which is to say, they voluntarily ceased working for respondent. The evidence further shows that, by order of the union, respondent's plant was picketed on April 30, 1941, and continuously thereafter.

The finding that respondent refused to reinstate the 18 employees mentioned implies that such reinstatement was requested. There is no evidence to that effect. Evidence claimed by the Board to show such request and such refusal shows, instead, the following facts:

On May 1, 1941, G. W. Duke (the union's president)[21] visited respondent's plant, discovered that, despite the strike and the picketing, the plant was being operated, and, upon making that discovery, said to C. H. Hoiles (respondent's secretary-treasurer and business manager):[22] "I see that you are going along fine. You have the shop full of men, but I want you to know that any time you get tired of this arrangement, we[23] are still willing to negotiate with you and come back into your employ as a group." Duke did not (as argued by the Board) thereby request reinstatement of the strikers. Instead, he merely expressed their willingness to return to work if and when, after further bargaining, an agreement was made. On what terms they were willing to make such an agreement Duke did not say.

■ To Duke's statement, quoted above, Hoiles replied: "And I want to say to you that any time any of your men wish to come back, you will be considered indi-vidually." Hoiles did not (as argued by the Board) thereby refuse to reinstate the strikers. Instead, he indicated that such reinstatement would be considered if and when they wished to return, which, the evidence shows, none of them ever did.

■ On or shortly after July 25, 1941, the union sent respondent an undated letter reading as follows: "At a meeting of [the union] held on Friday, July 25, the following action was taken by unanimous vote: The union requests a meeting with [respondent] for the purpose of renewing negotiations and reaching an agreement for the reinstatement of the former union employees of [respondent]." The union did not (as argued by the Board) thereby request reinstatement of the strikers. Instead, it merely requested a meeting for the purpose of bargaining and, if possible, making an agreement on that subject. On what terms the union was willing to make such an agreement the letter did not say.

On August 2, 1941, respondent sent the union a letter reading as follows:

"We acknowledge receipt of your letter of recent date which advises us of the action of your union as of July 25th last.

"The Santa Ana Register[24] has never refused to negotiate with you and will not refuse to negotiate with you now. Before sitting down with you, however, we should point out that since your members went out on strike on May 1st last,[25] nearly three months ago, it has been necessary for us to employ others to take the places of those who went out on strike.

"These new employees have now become a part of the establishment and we do not feel, in fairness to them, that we can replace them now. Furthermore, shortly after your members went out on strike, we offered, through your Mr. Duke then local president, to take back any of your members who were out on strike, whom we believed could be utilized if they returned to the Register because of vacancies we had at that time. These men did not return, however, and it was necessary to fill the vacancies by employing others who are now a part of our staff.

---

struction Co. v. National Labor Relations Board, supra; National Labor Relations Board v. Highland Park Mfg. Co., supra; Bethlehem Shipbuilding Corp. v. National Labor Relations Board, supra; Wilson & Co. v. National Labor Relations Board, supra; National Labor Relations Board v. Blanton Co., supra.

20 See footnote 2.
21 See footnote 16.
22 See footnote 13.
23 The strikers, one of whom was Duke himself.
24 See footnote 11.
25 Actually, the union's members went out on strike on April 30, 1941.

"On behalf of the management I [26] also feel it necessary to indicate to you that there has been no change in our situation since the union and the management found it impossible to get together on the questions of increased wages and apprentices.

"If you wish to sit down with us, in view of what I have written, the management will certainly not refuse to confer with you. We think it only fair, however, that before doing so you should be given our attitude, as outlined above."

■ Respondent did not (as argued by the Board) thereby refuse to reinstate the strikers. It did, however, quite properly, point out the fact that the strikers, by striking and remaining on strike, had made it necessary to employ others to take their places. It furthermore expressed the belief that to "replace" (dismiss) its new employees would be unfair. Whether it would or would not dismiss them if the strike were terminated it did not say. Whether, in the event of such termination, it could be required to dismiss them we have no occasion to decide, no such event having occurred.[27]

■ Despite respondent's expressed willingness to "renew negotiations" (resume bargaining) as requested in the union's letter, the union, after receiving respondent's letter, chose not to, and did not, bargain further with respondent. Its members, including the 18 employees mentioned, remained on strike. Reinstatement, so far as the evidence shows, was never requested by or for any of them, nor, so far as the evidence shows, was it ever refused.

We conclude that the finding that respondent discharged and refused to reinstate the 18 employees mentioned is wholly unsupported by evidence.

Third. Does the evidence support the finding that respondent's refusal to bargain collectively with the union as the representative of its employees tended to lead to labor disputes burdening and obstructing interstate commerce?

■ It is clear, we think, that respondent's refusal to bargain collectively with the union as the representative of its employees tended to lead to labor disputes, which tended to lead to strikes, which tended to lead to stoppages of respondent's operations. The effect of such stoppages would, of course, depend upon the character and extent of respondent's operations. As to these matters, the evidence shows:

In 1940 respondent used at its publishing plant in Santa Ana, California, 1,-431,000 pounds of newsprint valued at $34,636, all of which was shipped into California from points outside the State. It also caused to be shipped to it in 1940, from points outside the State, miscellaneous equipment and supplies valued at $7,000. It subscribed to the news services of the Associated Press, the United Press and the International News Service. Most of the news supplied to respondent by these services was transmitted to it from points outside the State. Such news constituted about 12% of all news published by respondent. "Special features" originating outside the State constituted about 7% of all reading matter published by respondent. About $15,000 (approximately 6%) of respondent's annual gross income was derived from advertising originating outside the State. About 50 copies of each issue of respondent's newspaper went to out-of-State subscribers or customers. Except for a decline in advertising, there was no substantial change in respondent's operations after 1940.

From these facts the Board could, as it did, infer that a stoppage of respondent's operations would have burdened and obstructed interstate commerce;[28] and this is

---

[26] C. H. Hoiles, who wrote and signed the letter for and on behalf of respondent. See footnote 13.

[27] The evidence shows that the strike continued from April 30, 1941, to the time of hearing—May 7, 1942—and was going on at that time. So far as we know, it is still going on.

[28] Cf. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U. S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A. L.R. 1352; National Labor Relations Board v. Freuhauf Trailer Co., 301 U.S.

49, 57 S.Ct. 642, 81 L.Ed. 918, 108 A.L.R. 1352; National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 57 S.Ct. 645, 81 L.Ed. 921, 108 A.L.R. 1352; Associated Press v. National Labor Relations Board, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953; Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L. Ed. 126; National Labor Relations Board

true despite the fact that the volume of interstate commerce which might have been affected by such stoppage was relatively small.[29]

■ True, there is no evidence that respondent's refusal to bargain collectively with the union as the representative of its employees did in fact lead to any labor dispute burdening or obstructing interstate commerce. That, however, is immaterial, for the Board did not find that the refusal did in fact lead to any such dispute. It did find, and the evidence supports the finding, that the refusal tended to lead to such disputes.

■ Thus two of the findings—that respondent refused to bargain collectively with the union as the representative of its employees, and that the refusal tended to lead to labor disputes burdening and obstructing interstate commerce—are supported by evidence and hence are conclusive.[30] These findings warrant the conclusions based on them—that respondent engaged in an unfair labor practice listed in § 8(1) and (5) of the Act, 29 U.S.C.A. § 158(1) and (5), and that this was an unfair labor practice affecting commerce within the meaning of §§ 2 and 10 of the Act, 29 U.S.C.A. §§ 152, 160.

The conclusion that respondent engaged in an unfair labor practice listed in § 8 (3) of the Act, 29 U.S.C.A. § 158(3), is based on the finding that respondent discharged and refused to reinstate the 18 employees mentioned above, which, as we have shown, is unsupported by evidence. Hence the conclusion is unwarranted.

The order[31] will be modified by striking therefrom the parts which are based on the finding and conclusion last above mentioned, which is to say, by striking therefrom paragraphs 1(a), 2(b) and 2(c), by striking from paragraph 2(d) subdivision (3) thereof, and by striking from subdivisions (1) an (2) of paragraph 2(d) all references to paragraphs 1(a), 2(b) and 2(c). The order will be further modified so that, instead of requiring notice to be given to the Board's Regional Director within 10 days from the date of the order,

it will require such notice to be given within 10 days from the date on which our decree becomes final.

As thus modified, the order will be enforced.

---

v. Fainblatt, 306 U.S. 601, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014; National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 60 S.Ct. 918, 84 L.Ed. 1226; National Labor Relations Board v. Hearst, 9 Cir., 102 F.2d 658;

National Labor Relations Board v. A. S. Abell Co., 4 Cir., 97 F.2d 951.

[29] National Labor Relations Board v. Fainblatt, supra.

[30] National Labor Relations Act, § 10 (e), 29 U.S.C.A. § 160(e).

