**UNITED STATES v. MONTGOMERY WARD & CO., Inc., et al.**

No. 8765.

Circuit Court of Appeals, Seventh Circuit.

June 8, 1945.

Writ of Certiorari Granted Nov. 5, 1945.

See 66 S.Ct. 140.

Paul Freund, Sp. Asst. to the Atty. Gen., Robert Barnard, John P. Frank, Charles Fahy and Hugh B. Cox, Sol. Gen., all of Washington, D. C., Fowler Hamilton, Asst. Atty. Gen., and J. Albert Woll, U. S. Atty., of Chicago, Ill., for appellant.

Stuart S. Ball, John A. Barr, Harold A. Smith, and Charles J. Calderini, all of Chicago, Ill., and Guy A. Gladson and Arthur D. Welton, Jr., both of Chicago, Ill., for appellees.

Before EVANS, SPARKS, and KERNER, Circuit Judges.

EVANS, Circuit Judge.

In this declaratory judgment suit, the United States seeks to establish the legality of the Presidential order of seizure of several of Ward's retail stores and properties, and to enjoin interference with its possession thereof.

The complaint was supported by affidavits. Defendants in turn filed an answer, supported by their affidavits. There was a single hearing on the temporary and permanent injunction applications. No oral testimony was offered. Judge Sullivan filed a carefullv prepared opinion and made findings of fact and conclusions of law. 58 F.Supp. 408. The final decree, based thereon was a dismissal of the suit with costs, and a determination that the United States was not entitled to an injunction; that its seizure was not justified and its possession of defendants' property unauthorized.

The court then entered an order staying judgment, pending final disposition of the suit on appeal. Plaintiff sought a writ of certiorari from the Supreme Court, which was denied "for the reason that application has been made prior to judgment of the Circuit Court of Appeals." 65 S.Ct. 862.

The Facts: The facts are presented by many affidavits of officers of the Government and of the defendants, of army officers, of union officials, and of employees of Ward's. Very briefly stated, they disclose that Ward's, an Illinois corporation, is the second largest business of its kind (mail order) in the United States, its net sales for the year ending January 31, 1944, being $595,932,821. It has over 600 retail stores, and over 30,000,000 customers. It operates three factories (not here involved) making less than 2% of the products it sells. It has 70,000 employees. It sells, inter alia: auto supplies, building materials, farm machinery, equipment and supplies including repair parts; heating apparatus; electrical supplies; clothing and shoes; drugs; furniture; hardware; home furnishings; dry goods; and groceries.

Its sales of farm machinery and farm equipment to farmers aggregate $35,000,-000 a year. Its catalogue lists 130,000 items. It has filed 35,466 applications for priority distribution of articles. These applications state Ward's requires the articles for the war effort. It has commitments under lend lease equipment totaling

$250,000, and contracts aggregating $1,-215,000 for wearing apparel for use in liberated countries.

*Historical Background of War Labor Disputes Act and the Instant Executive Order.* The predecessor of the War Labor Board, the National Defense Mediation Board, was established, March 19, 1941, by the Presidential Executive Order No. 8716. It heard many disputes involving thousands of employees, most of which were settled amicably. The President ordered the seizure of a few plants which were relinquished upon settlement of the disputes.

On December 17, 1941, after Pearl Harbor, the President convened a conference of twelve representatives of industry and twelve representatives of labor, which reached unanimous agreement on three points: There should be no strikes or lockouts for the duration of the war; all labor disputes should be settled by peaceful means; a tripartite War Labor Board should be set up to handle the disputes.

The President effectuated the report of the conference by establishing the National War Labor Board, January 12, 1942, by Executive Order No. 9017, 50 U.S.C.A.Appendix § 1507 note [1]

This executive order recited the fact that "national interest demands there shall be no interruption of any work which contributes to the effective prosecution of the war."

The Board was composed of twelve special commissioners appointed by the President; four are representative of the public; four, of employers; and four, of employees. The order concluded by transferring the personnel and funds of the Mediation Board to the War Labor Board, and stating that nothing in the Order should be construed as being in conflict with or superseding, inter alia, the Fair Labor Standards Act.

The War Labor Board's chairman states that its decisions have been "virtually unanimously" accepted. This Board may take jurisdiction of disputes, not only on certification by the Secretary of Labor, but on its own motion, which was not true of the Mediation Board. The Board has twelve regional boards, all of which are also tripartite in character.

It was after the bituminous coal strike that the Congress enacted the War Labor Disputes Act on June 25, 1943, 50 U.S.C.A. Appendix § 1501 et seq., which Act gave the Board power to issue subpoenas, enforceable by courts, and conferred jurisdiction upon it, even in the absence of a party failing to appear, to decide a dispute, the hearing of which was initiated by the Board's own action.[2] The Act referred to,

---

[1] Executive Order No. 9017. Establishment of National War Labor Board.

"Whereas by reason of the state of war * * * the national interest demands that there shall be no interruption of any work which contributes to the effective prosecution of the war; and

"Whereas * * * a conference of representatives of labor and industry * * * has * * * agreed that for the duration of the war there shall be no strikes or lock-outs, and that all labor disputes shall be settled by peaceful means, and that a National War Labor Board be established for the peaceful adjustment of such disputes:

"Now, Therefore, * * * 1. There is hereby created * * * a National War Labor Board, * * *. The Board shall be composed of twelve special commissioners to be appointed by the President. Four of the members shall be representative of the public; four shall be representative of employees; and four shall be representative of employers. * * *

"7. Nothing herein shall be construed as superseding or in conflict with the provisions of the Railway Labor Act * * *; the National Labor Relations Act * * * the Fair Labor Standards Act * * *."

[2] The pertinent parts of the statute (50 U.S.C.A.Appendix § 1501 et seq.) establishing the War Labor Board:

"An Act relating to the use and operation by the United States of certain plants, mines, and facilities in the prosecution of the war, and preventing strikes, lock-outs, and stoppages of production, and for other purposes."

"Sec. 2(b) The term 'war contract' means — * * * (3) a contract * * * for the production, manufacture, construction, reconstruction, installation, maintenance, storage, repair, mining, or transportation of * * * (C) any * * * commodity * * * the production, manufacture, construction, reconstruction, installation, maintenance, storage, repair, mining, or transportation of which by the contractor in question is found by the President as being contracted for in the prosecution of the war.

"(c) The term 'war contractor' means the person producing, manufacturing, constructing, reconstructing, installing, maintaining, storing, repairing, mining, or transporting under a war contract or a person whose plant, mine, or facility is equipped for the manufacture, production, or mining of any articles or materials

and sanctioned, the existing Board, established by the Executive Order No. 9017.

In the period from January 12, 1942, to October 27, 1944, the Board and its branches have handled approximately 362,-000 disputes and voluntary wage cases involving approximately 24,000,000 employees. Mr. Vinson's affidavit states that "200,000 wage cases must be processed by the National War Labor Board each year."

Only 31 of the 362,000 cases involving disputes have been certified by the Board to the President for action.

Not only the Executive Order, but the War Labor Disputes Act, referred to the Fair Labor Standards Act and provided that "In making any such decision (relative to a dispute concerning wages and hours) the Board shall conform to the provisions of the Fair Labor Standards Act * *" as well as the National Labor Relations Act and the Emergency Price Control Act.

Affidavits of Government officials attest to the indispensable place the War Labor Board holds in maintaining a wartime economy uninterrupted by labor disputes and strikes. They also show that early in the war the United States sought to keep down prices and avoid inflation, and this was to be accomplished through the establishment of a maximum or ceiling wage. Maintenance of living costs was the goal which depended for success largely on the maintenance of a wage ceiling which was tied to the so-called Little Steel Formula.

The transfer of millions of wage earners to the Army created acute demands for labor which would, so it is averred, have resulted in rapid rise in wages but for the effort of the National War Labor Board and its predecessor, the National Defense Mediation Board. The basis of their success was their action in holding the maximum wage to the Little Steel Formula together with the laborers' agreement not

which may be required in the prosecution of the war or which may be useful in connection therewith; * * *."

"Sec. 3. Section 9 of the Selective Training and Service Act * * * is hereby amended by adding at the end thereof the following new paragraph:

"The power of the President under the foregoing provisions of this section to take immediate possession of any plant upon a failure to comply with any such provisions, and the authority granted by this section for the use and operation by the United States or in its interests of any plant of which possession is so taken, shall also apply as hereinafter provided to any plant, mine, or facility equipped for the manufacture, production, or mining of any articles or materials which may be required for the war effort or which may be useful in connection therewith. Such power and authority may be exercised by the President through such department or agency of the Government as he may designate, and may be exercised with respect to any such plant, mine, or facility whenever the President finds, after investigation, and proclaims that there is an interruption of the operation of such plant, mine, or facility as a result of a strike or other labor disturbance, that the war effort will be unduly impeded or delayed by such interruption, and that the exercise of such power and authority is necessary to insure the operation of such plant, mine, or facility in the interest of the war effort: * * *."

"Sec. 7. (a) The National War Labor Board * * * established by Executive

Order Numbered 9017 * * * in addition to all powers conferred on it by * * any Executive order * * * shall have the following powers and duties:

"(1) Whenever the * * * Conciliation Service * * * certifies that a labor dispute exists which may lead to substantial interference with the war effort, * * * to summon both parties * * * before it and conduct a public hearing on the merits of the dispute. If in the opinion of the Board a labor dispute has become so serious that it may lead to substantial interference with the war effort, the Board may take such action on its own motion. At such hearing both parties shall be given full notice and opportunity to be heard, but the failure of either party to appear shall not deprive the Board of jurisdiction to proceed to a hearing and order.

"(2) To decide the dispute * * *. In making any such decision the Board shall conform to the provisions of the Fair Labor Standards Act * * *; the National Labor Relations Act * * *."

Section 9 of the Selective Training and Service Act, 50 U.S.C.A.Appendix § 309, of which the above-quoted Section 3 is amendatory, provides for the seizure by the President of plants manufacturing arms and ammunitions or supplies and equipment for the Army or Navy, where the owner refuses to give Government contracts precedence, or to fill orders therefor, and provides for just compensation for such use.

to strike and the employers' agreement to abide by the Board's rulings.

Coming now to the history of the conflict out of which this suit arises, it appears that ever since June, 1942, a bitter controversy has been waged between defendants and the labor unions representing a large number, and allegedly a majority, of Ward's employees.

At that time, the Secretary of Labor certified to the Board, a dispute between Ward's and the Union, the certified bargaining agency of its employees, over the terms and conditions of a proposed collective bargaining agreement between them which related to union security, arbitration of employee grievances, and seniority. These issues, and the important issue of increased wages and check-off, are the elements which incite the dispute out of which the present conflict arises. The Board heard and passed on the controverted issues. It decided against the defendants. Ward's refused to obey the Board's order.

A brief statement of Ward's disputes and controversies is here set forth.

*In Chicago.* Local 20 had been designated the bargaining agent for certain of Ward's employees on February 19, 1942. Thereafter, the Secretary of Labor certified to the Board the existence of a labor dispute between the Union and Ward's. A report was filed respecting wages, and a directive later issued which was voluntarily accepted by Ward's. Subsequently, a report dealing with other issues—union security, seniority, arbitration—was made, and an order entered on it, which Ward's refused to obey unless ordered by the President to do so; the President wrote a letter ordering compliance, and Ward's complied. On December 8, 1942, a contract was made between the Union and Ward's, for the term of a year. It was at the expiration of this contract that the present serious trouble germinated. Ward's notified the Union it would not renew the contract because it contended the Union did not represent a majority of the employees in the unit. Over this issue a dispute arose; it was certified to the Board and a hearing had, at which the Company maintained the Union represented only a small group. The Board entered an interim order to extend the contract for a month, while ascertaining whether the Union was the proper agent; Ward's refused to extend the

agreement for a month and the Board held a public hearing. The Union called a strike on April 12, 1944, and during the period of April 12 to 24, 5,500 were on strike. The Board voted to refer the case to the President. Other local unions in Chicago war plants voted to support Ward's employees, and some unionites refused to make deliveries to Ward's. The President, on the 23rd, wired Mr. Avery, the Chairman of the Board of Directors, and the Union to abide by the order until the election. The Union acceded and returned to work, but Ward's, on the 25th, said they refused to comply. That day the President issued Order 9438 directing possession of the plant be taken by the Secretary of Commerce. Possession was taken by the United States, but not recognized by Ward's. Thereupon the United States filed its first suit in the District Court in this circuit for an injunction against interference, which suit was dismissed when the Government relinquished possession.

An election was held on May 9 and the Union received a substantial majority of the votes. The Board then held a hearing as to why the December, 1942, contract should not be continued, and ordered its continuance. The portions of the directives which Ward's objected to were arbitration of grievances, seniority principle in dismissal, and maintenance of union security.

No new agreement has been effected.

In January, 1943, there was a dispute in the printing department of Ward's in Chicago, on which dispute hearings were held September 23rd and 24th. A directive was issued in June, 1944. In December, 1944, the Board ordered Ward's to comply with the directive. This directive, Ward's failed to obey.

A former controversy between Ward's and its employees in Chicago reached the National Labor Relations Board, and then this court. Our opinion is found in Montgomery Ward & Co. v. National Labor Relations Board, 107 F.2d 555. The Board charged Ward's with having coerced its employees in the exercise of their right to self-organization and with refusing to bargain with the union, in violation of Section 8 of the Act, 29 U.S.C.A. § 158, and it had discriminatorily discharged fifty-two of its employees in violation of Section 8. The Board found against Ward's on these charges and its action was sustained by this court.

*The Detroit* [3], *Dearborn, and Royal Oak* [4], *Michigan, Disputes.* The Secretary of Labor certified a dispute in December, 1942; hearings were held in January, 1943; and the Board directed the defendant to recede on certain of its contentions, such as seniority. Ward's refused. In August of 1943 the Board directed Ward's to raise certain wages, but it refused. On December 9, 1944, a strike was called because Ward's refused to comply with the Board's directives. At a meeting in Detroit, 200 local unions pledged support. There was some violence in the Detroit strike. The Board held another public hearing re the strike, and issued a directive confirming its previous orders. Ward's refused to obey.

*The Denver* [5], *Colorado, Dispute.* In December, 1942, the certification of the Secretary of Labor to the Board of the Michigan dispute was amended to include a Denver dispute re wages, arbitration, etc. No agreement had been reached with the union, Local 269, which had been designated as the bargaining agent for the employees. (The union had 235 members.) A wage order was entered, August 20, 1943, with which Ward's has not complied. In December, 1944, the Board held a hearing and issued an order in accordance with its previous directives. Ward's has continued to refuse to comply.

*The Jamaica* [6], *New York, Dispute.* Local No. 10 (250 members) had been certified on April 14, 1944, as the exclusive bargaining agent. On December 15, 1944, the Board held a hearing and issued an order reaffirming its prior orders (which had extended the Michigan order to New York). The defendants refused to comply.

*The St. Paul* [7], *Minnesota, Dispute.* In February, 1943, the Secretary of Labor certified a dispute to the Board, involving some 1,100 employees, represented by Local 215. Hearings on twenty issues were held, April 16 and 17, and on August 31, the Board ordered that the March 14, 1944, order of the Regional War Labor Board in Chicago should govern Ward's and its em-

ployees' relations. On December 15, the Board held a hearing on Ward's noncompliance and issued order reaffirming its prior orders. Ward's refused to comply.

*The Portland* [8], *Oregon, Dispute.* In August, 1940, the Union was certified as the bargaining agent, but no agreement was reached and a strike occurred in December, 1940. There was a hearing before the National Labor Relations Board, and an order made, which was upheld by the Ninth Circuit (Montgomery Ward & Co. v. National Labor Relations Board, 133 F.2d 676, 146 A.L.R. 1045). In February of 1943, the Secretary of Labor certified a dispute to the Board, between the Company and the union (having 800 members). In August of 1943, the Regional War Labor Board issued a directive, after hearing, of 49¢ an hour minimum pay, effective July 26, 1943. In November, Ward's appeal was denied by the Board. Ward's refused to comply with the order. In December, a hearing was had at which Ward's failed to appear. The Board reaffirmed its order, granting Ward's to December 18, to comply. Ward's refused to comply.

*The San Rafael* [9], *California, Dispute.* In February, 1943, the Company recognized the Union as the bargaining agent, but no agreement was reached. A dispute was certified to the Board in April and hearing held June 11, 1943. In July and September, 1943, there were panel report and recommendation. In January, 1944, the Board's officer reported. In August, 1944, the Board issued an order that the Tenth Regional War Labor Board Order be applied to the defendant, but defendant refused to comply. In December, 1944, public hearing was had on the noncompliance and an order entered reaffirming the directives and giving defendant until December 18 to comply. Ward's refused so to comply with the directives. The Company did not appear at this hearing.

*Contention of the Parties.* The United States predicates its demand for an injunction on two grounds: (A) The seizure

---

[3] Union Director (Scoggins) states he was in charge of strike at Detroit stores and about 900 out of 1200 employees struck and stores had difficulty operating.

[4] Possession taken by Army, Jan. 2, 1945; affidavit of McKasy. Mr. Barden, Mgr., refusing to remain as manager, was dismissed.

[5] Possession taken by Army, December 28, 1944 (Affidavit of Helioff).

[6] Possession taken, December 28, 1944, Affidavit Carson.

[7] 471 employees in retail store; 2500 in mail order house.

[8] Possession taken December 28, 1944. Affidavit Klinefelter.

[9] Possession taken by Army, December 28, 1944. Affidavit Alexander.

was a valid exercise of the President's constitutional power as Commander-in-Chief of the Army and Navy, a power implied from his obligation to prosecute the war to a successful end. (B) The seizure is authorized by the War Labor Disputes Act inasmuch as the labor disputes here involved threatened to interfere with the successful prosecution of the war as found in the President's Executive Order. The language of the War Labor Disputes Act discloses an intent to cover businesses such as the one operated by Ward's.

Defendants maintain: (A) The President has no power as Commander-in-Chief to seize Ward's property, his power as Commander-in-Chief being *strictly military* in character, and is governed by the decisions which require protection against unreasonable searches and seizures under the Fourth and Fifth Amendments.

(B) Congress did not grant the power to seize such plants as Ward's, by Section 3 of the War Labor Disputes Act, which amends Section 9 of the Selective Training and Service Act of 1940, even though such power exists to seize certain plants, the operation of which is threatened by labor disputes and the employer refuses to obey the directive of the War Labor Board. Ward's argues "that its properties equipped only for the distribution of general merchandise by sale at retail are not properties for the manufacture, production or mining of articles or materials useful in the war effort" within the meaning of said Section 3.

Upon the continued and repeated refusals of Ward's to obey its directives, the War Labor Board referred the matter to the President who made his order [10] which resulted in the seizure.

---

[10] "Whereas the * * * Board has found * * * that labor disturbances involving nearly 12,000 workers now exist in the plants and facilities of * * * Ward * * * in Jamaica, Detroit, Chicago, St. Paul, Denver, San Rafael, and Portland, * * * ; * * * that the Board has issued * * * orders deciding the labor disputes * * * ; that the terms * * provided * * * by the * * * orders are fair and equitable to employer and employee * * * ; that * * * Ward * * * has refused to put into effect the terms * * * contained in these * * orders; that as a result of the refusal * * * of * * * Ward * * * a serious strike involving approximately 1,800 employees is now in progress (in Detroit) * * * ; that there is present danger that the strike * * * will spread to plants and facilities of * * * Ward * * * located in other cities and will adversely affect the operation of other plants and facilities, located in the Detroit area and elsewhere, that are engaged in the production of materials used in the prosecution of the war; and

"Whereas the * * * Board has also found * * * that * * * Ward * * * employs approximately 70,000 workers, and serves approximately 30 million customers; that an interruption of the Company activities would unduly delay and impede the war effort; that the preservation of the war-time structure of labor relations and the prevention of interruptions of war production depend upon the peaceful settlement of labor disputes by the * * * Board; * * * that the preservation of the national stabilization program requires peaceful settlement of wage disputes during the war by the

procedure provided for by the Congress; that the persistent refusal of * * * Ward * * * to put into effect the terms * * * contained in * * * orders issued by the * * * Board, * * threatens to destroy both the wartime structure of labor relations and the procedure established by the Congress for the peaceful settlement of wage disputes during the war, and unduly impedes and delays the war effort; and

"Whereas after investigation I find and proclaim that the plants and facilities of * * * Ward * * * located in (above-listed cities) * * * are plants and facilities that are equipped for the production of articles or materials which may be required for the war effort or which may be useful in connection therewith, within the meaning of the War Labor Disputes Act; that * * * Ward * * * is engaged in the distribution of articles and materials that are essential to the maintenance of the war economy; that as a result of labor disturbances there are existing and threatened interruptions of the operation of the said plants and facilities of * * * Ward * * * ; that the war effort will be unduly impeded or delayed by these interruptions; that the operation of other plants and facilities essential to the war effort is threatened by the labor disturbances at the plants and facilities of * * * Ward; and that the exercise * * * of the powers * * * vested in me is necessary to insure, in the interest of the war effort, the operation of these plants * * * and of other plants * * that are threatened to be affected by the said labor disturbances; and

"Whereas * * * I also find * * * that these existing and threatened inter-

### Construction of War Labor Disputes Act.[11]

The controlling legal question on one phase of this case is a narrow one: Did Congress intend to invest the President with the power to seize a general retail department and mail order business, when it provided for the seizure of "any plant, mine, or facility equipped for the manufacture, production, or mining of any articles or materials which may be required for the war effort or which may be useful in connection therewith"? Even more narrowly that issue might be put—Does the word "production" comprehend "distribution"?

The meaning of the word "production" as used in this statute is the immediate subject of our inquiry. It is the focal point around which this legal battle revolves. Obviously, it is a term of rather broad and comprehensive meaning. As such words usually are, it is of elastic meaning. It and the associate word "produce" take an entire page in the Oxford Dictionary to define and illustrate their meaning. Counsel have earnestly and ably endeavored to enlighten and instruct us as to the proper scope of this word, as used both in common speech and in legal documents. That we must define it, as it is used in this statute and with an existing war background and recognize the obvious purpose of the enactment, is hardly debatable.

The Act was passed when Germany was making her most successful counter drive in the war after the United States entered it. The United States Government had some eight million soldiers, sailors and marines in Europe and in the South Pacific. Millions more were in camps in the United States, training to go abroad.

█ Fortunately, Congress did not leave us with this vexatious and disputatious question without some guidance. No more helpful canon of construction can hardly be found for the determination of the meaning of words used in the legislative enactments than the following: "Unless the context indicates otherwise, words and phrases in a provision that were used in a prior act pertaining to the same subject matter will be construed to be used in the same sense." Section 5201, Sutherland, on Statutory Construction.

This view has found expression many times by courts of last resort. The importance of the rule in the present discussion justifies a few quotations from the authorities.

In Reiche v. Smythe, 13 Wall. 162, 165, 80 U.S. 162, 20 L.Ed. 566, it was said: "Both acts are *in pari materia*, and it will be presumed that if the same word be used in both, and a special meaning were given it in the first act, that it was intended it should receive the same interpretation in the latter act, in the absence of anything to show a contrary intention."

More recently, in United States v. Stewart, 311 U.S. 60, 61 S.Ct. 102, 105, 85 L.Ed. 40, the Court said: "It is clear that 'all acts *in pari materia* are to be taken together, as if they were one law.' United States v. Freeman, 3 How. 556, 564,

---

ruptions result from the failure of * * * Ward * * * to adjust labor disputes * * * that the Board has considered these disputes and issued * * * orders determining * * * methods of their adjustment; that the labor unions involved have expressed their willingness to adjust the disputes in accordance with the * * * orders of the * * * Board, but * * * Ward * * * has persistently refused to accept the provisions of the * * * orders * * * and that this refusal unduly impedes and delays the successful prosecution of the war;

"Now, Therefore, by virtue of the power and authority vested in me by the Constitution and laws of the United States, including the War Labor Disputes Act * * * and Section 9 of the Selective Training and Service Act of 1940 * * * as President of the United States and Commander in Chief of the Army and Navy of the United States, it is hereby ordered as follows:

"1. The Secretary of War is hereby authorized and directed * * * to take possession of the plants and facilities of * * * Ward (specifying them) * * *

"2. The Secretary of War shall operate the said plants and facilities under the terms and conditions of employment that are in effect at the time possession of the said plants is taken, and during his operation of the plants and facilities shall observe the terms and conditions of the * * * orders of the * * * Board, including those dated June 6 and 16, 1944, and December 14 and 15, 1944, * * *.

"3. All federal agencies * * * are directed to cooperate with the Secretary of War to the fullest extent possible in carrying out the purposes of this order. * * * "

11 57 Stat. 163, 50 U.S.C.A.App. § 1501, et seq.

11 L.Ed. 724. That these two acts are in *pari materia* is plain. Both deal with precisely the same subject matter * * *. The later act can therefore be regarded as a legislative interpretation of the earlier act * * * in the same sense that it aids in ascertaining the meaning of the words as used in their contemporary setting. It is therefore entitled to great weight in resolving any ambiguities and doubts. * * *"

In United States v. Jefferson Electric Co., 291 U.S. 386, 54 S.Ct. 443, 447, 78 L. Ed. 859, it was said: "As a general rule where the legislation dealing with a particular subject consists of a system of related general provisions indicative of a settled policy, new enactments of a fragmentary nature on that subject are to be taken as intended to fit into the existing system and to be carried into effect conformably to it, excepting as a different purpose is plainly shown."

Our search then becomes one to ascertain whether Congress has used the word "production" in the same or previous statutes dealing with the same or kindred subjects.

Prior to the passage of the War Labor Disputes Act, Congress enacted the Fair Labor Standards Act [12] which also dealt with the employer-employee relationship. In both acts machinery is set up for the settlement of disputes between employer and employee. The Fair Labor Standards Act dealt with peace time labor relations while the War Labor Disputes Act dealt with war time employer-employee relations. The War Labor Disputes Act, by specific reference in Section 7(a) (2), 50 U.S.C.A. Appendix § 1507(a) (2), referred to the Fair Labor Standards Act, providing the Board should have power

"To decide the dispute, and provide by order the wages and hours and all other terms and conditions * * *. In making any such decision the *Board shall conform to the provisions of the Fair Labor Standards Act * * *.*"

In the Fair Labor Standards Act, Congress specifically defined certain words which it used. Among the words thus defined were "produced" and "production." It defined those who were engaged in production, for employers and employees so engaged were made subject to the Act.

We quote the definitions there given from Section 203(j):

" 'Produced' means produced, manufactured, mined, *handled, or in any other manner worked on* in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, *handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof,* in any State."

The Supreme Court, in Western Union Telegraph Co. v. Lenroot, 323 U. S. 490, 65 S.Ct. 335, 342, speaking of the words "handled" and "worked on" used in the above statute, said:

" * * * We are clear that 'handled' or 'worked on' includes every kind of incidental operation preparatory to putting goods into the stream of commerce."

We have, then, a Congressional definition of the word which we are asked to define, in another Congressional Act. Our acceptance of it necessarily follows unless a contrary intention may be found in the later statute. It is possible Congress might have given a different meaning to the same word in the same statute or in statutes which are in *pari materia,* but a rather heavy load rests on him who would give different meanings to the same word or the same phrase when used a plurality of times in the same Act or in Acts which are in *pari materia* with each other. Courts permit parties to a contract to be their own lexicographers, but two different meanings to the same word will not be indulged in when the contract is before the court for construction.

Nor is this our only guide. The construction of war time legislation has frequently been the subject of judicial decision. Canons of construction have been pronounced. One such rule is stated by Sutherland, on Statutory Construction, § 7216, as follows:

"It is *imperative* that legislation providing for national defense and the prosecution of war shall be liberally construed to accomplish its important objectives." Sweetser v. Emerson, 1 Cir., 236 F. 161-163, Ann.Cas.1917B, 244.

---

[12] 52 Stat. 1060, 29 U.S.C.A. § 201, et seq.

■ Equally helpful is another rule which courts have adopted in construing war statutes. Sutherland states it thus:

"Likewise, legislation pertaining to war production must not be impeded by technical interpretations.[13] In time of war, criminal statutes pertaining to national defense and the unimpaired conduct of the war should not be given the strict construction which is ordinarily applied to penal statutes;[14] and it has not been uncommon for the courts to recognize that a statute may have a different meaning in time of war than it does have in time of peace.[15]"

See also opinion of this court, Bowles v. Montgomery Ward, 7 Cir., 143 F.2d 38.

■ Quite significant is the inclusion of the word "transportation" in the definition of the word "production" in the Fair Labor Standards Act. Moreover, in the Act under consideration the Congress included transportation when it defined the subject matter of a war contract. Ward's activities go much further than transportation, and yet transportation is a form of production.

That Congress intended to include transportation and the employees engaged therein in the Act under consideration appears from Section 7(e), 50 U.S.C.A. Appendix § 1507 (e), which provides that:

"The Board shall not have any powers under this section with respect to any matter within the purview of the Railway Labor Act as amended."

This section was inserted on the theory, and can be explained on no other theory, than that otherwise the War Labor Disputes Act included all disputes arising out of transportation company relations with its employees. It excepted from its purview those transportation cases governed by the Railway Labor Act as amended, 45 U.S.C. A. § 151 et seq. It could not have covered any transportation case unless the word "production" be given a meaning which included transportation.

■ Ward's own action was a recognition of the applicability of this Act. It recognized its close relationship to, and its participation in, the war effort when, in tens of thousands of written applications to the Government for the many priorities of

substantial amount which it sought, it stated:

"This merchandise (automobile supplies) is to be sold through our sixty retail farm supply stores in California, Nevada and Arizona, serving the vital war manufacturing centers as well as the farmers."

"Brushes (paint) are used by farmers and householders for maintenance and upkeep and the War Industries for production in this area."

"Wire scratch brushes are essential to the preparation of the surface for painting, welding and soldering in the maintenance of farm buildings, equipment and homes."

"This merchandise is to be shipped direct from the producer. We have a demand for these tools from men engaged in local defense plants and merchandise in various types of repair shops in this community. This is a vital defense area."

"These milk and bath testing thermometers are necessary for infants' proper care and maintenance of health. They are distributed through our General Mail Order Catalog which reaches people throughout the country who would otherwise be unable to secure this merchandise in any other way."

In all or nearly all its applications for priority it relied upon the fact that its goods were to be used in vital war areas.

It is hardly consistent for Ward's to deny it was engaged in production, after securing priorities on the basis of the fact its "merchandise is to be shipped directly from the producer to men engaged in local defense plants" and a demand for "merchandise in various types of repair shops in a community which is a vital defense area."

■ Our conclusion is that the definition of the word "production" in the Fair Labor Standards Act controls us in the definition of the same word in this Act.

■ We are also persuaded that even though the definition of the word "production" in the Fair Labor Standards Act did not determine the question, we could not except Ward's business, its plant, and facilities from the adjustment of its labor disputes by the Board during this war. For without the aid of this statute

[13] Roxford Knitting Co. v. Moore & Tierney, 2 Cir., 1920, 265 F. 177, 11 A.L. R. 1415.

[14] Anderson v. United States, 8 Cir., 1920, 264 F. 75; State v. Bartels, 191 Iowa 1060, 181 N.W. 508 (1921).

[15] Schenck v. United States, 1919, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470.

or any court's decision elucidating it, the query naturally arises and must be answered—"What definition of the word 'production' could otherwise be given when it is used in addition to the word 'manufacture' "? [16]

Who are engaged in production after excluding those engaged in manufacture?

One answer might be—farmers. But if the farmers were represented by counsel, could they not say—"We farmers do not produce. Nature produces the crops. Farmers are mere instrumentalities who help, but they do not produce." If their contention be overruled, as it promptly would be, may they not be heard to say that farming activities call for hauling of mineral fertilizer, and limestone to the farm to strengthen the soil and remove acidity, and in so doing farmers are not engaged in production. Or, if after the crops are harvested and the hogs are fattened and the cattle and sheep are made ready for market the farmer takes his truck and hauls them to the packing plant, would he cease to be a producer when so engaged? Or if, instead of hauling the livestock to market himself, or the fertilizers to the farm, he hires a trucker to haul them to market, what is the trucker? And what of the tractors and trucks and other farm machinery used on the farm and what of those who make, sell, and deliver this machinery to the farmers? Are they not all engaged in production in the broad sense used in this statute? Billing and packing, selling and delivering tires, tractors, and trucks are quite as closely related to production as hauling the fertilizers to the farms to increase the size of crops or prevent soil deterioration.

In the many cases which involve the application of acts of Congress to commercial activities, it has been necessary to determine when and under what circumstances a transaction is interstate commerce in character. Likewise it has been necessary to determine when one employed in an apparently local activity (an intrastate activity) is nevertheless engaged in interstate commerce because he *contributes* thereto. It has been uniformly held that the employee whose activity is local in character is nevertheless engaged in interstate commerce when he contributes to the interstate character of said business.

It was held in Overstreet v. North Shore Corporation, 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656,

"The Fair Labor Standards Act is applicable to employees * * * who are engaged in the operation and maintenance of a drawbridge which is part of a toll road used extensively by persons and vehicles traveling in interstate commerce, and which spans an intercoastal waterway used in interstate commerce. So held as to one employee who attended to the raising and lowering of the bridge; another who was engaged in the maintenance and repair of the bridge; and a third who collected tolls from users of the road and bridge."

In the case of Overnight Motor Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L. Ed. 1682, it was held

"An employee of an interstate motor transportation company, who acted as rate clerk and performed other incidental duties, held 'engaged in commerce' within the meaning of § 7 of the Fair Labor Standards Act [29 U.S.C.A. § 207] * * *."

Again, in Walton v. Southern Package Corporation, 320 U.S. 540, 64 S.Ct. 320, 88 L.Ed. 298, it was held

"A night watchman for a manufacturing plant which shipped a substantial portion of its product in interstate commerce, held covered by the Fair Labor Standards Act of 1938, as one engaged in an 'occupation necessary to the production' of goods for interstate commerce."

In United States v. Darby Lumber Co., 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430, it was held that the employees of manufacturers engaged in the business of acquiring raw materials which they manufacture into finished lumber with the intent, when manufactured, to ship it in interstate commerce to customers outside the state and engaged in actually shipping a large part of the lumber so produced in interstate commerce, are engaged in the "production of goods for commerce" within the wage and hour requirements.

See also Warren Bradshaw Co. v. Hill, 317 U.S. 88, 91, 63 S.Ct. 125, 87 L.Ed. 83.

The Supreme Court has passed on numerous questions involving the query "Who are engaged in production"?

In Kirschbaum Co. v. Walling, 316 U. S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638, the

---

[16] "It is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute." Kent's Comm. (13th Ed. 1884) 462.

Court held that employees engaged in the maintenance and operation of a building such as engineer, fireman, elevator operators, watchmen, carpenter, and carpenter's helper were all engaged in the production of goods.

In Armour & Co. v. Wantock, 323 U.S. 126, 65 S.Ct. 165, the Court held that employees who were fire fighters in the plant were engaged in production and covered by the Fair Labor Standards Act.

We may take another illustration —the manufacture of steel. The iron mines are far removed from the steel mills. They are owned by different companies. The ore is transported over railroads and steamboats thousands of miles. Is the loading or unloading at the docks or the hauling of ore, production? We think an affirmative answer is unavoidable.

Some steel mills were engaged during this war in seeking old scrap iron which was bought and hauled from the countryside to the steel mills where it was again heated and purified by the steel companies in their furnaces. Were the men engaged in searching for the scrap, in buying and collecting it and transporting it, not engaged in production? And can we distinguish between their activities and those of Ward's who acquired the goods from the manufacturer, then packed, shipped, and delivered them to the consumers who were engaged in producing food or war equipment?

Other facts which throw light upon the proper construction of this statute, are the general facts which constitute the background of the legislation.

We are dealing with a war act. It purported to grant to the President and Commander in Chief of the Army and Navy the power to deal with the effort to make the greatest war in history a successful one—a war, which if lost would make individual property rights, such as defendants', guaranteed by the Federal Constitution, valueless.

The Act was passed on the assumption that this was, and is, an all-out war. There are two groups serving the war— the fighting forces at the front, helpless if not supplied with food and clothing and military equipment from home, representing one group. The civilians at home, who are engaged in supplying the fighting forces at the front, constitute the other group.

It would be idle to compare the efforts or sacrifice of the two groups. Ultimate success depends on the efforts and the complete cooperation of both. To accomplish this end, vast armies of men and women are devoting their efforts in both fields of activity.

At home, alas, labor disputes between employer and employees have arisen, some more serious than others. One arose in the coal field which resulted in a threatened suspension of production. It led to a seizure of the coal mines. Also, it provoked this legislation. The instant contest arose after the passage of this Act and is the only other serious threat to the interruption of a large business through its refusal to obey the order of the Board.

Possible interruption of production by any group of seventy thousand employees is serious. It matters not whether this group is actually engaged in making articles needful in the war, or in distributing such articles among those engaged in essential war industry.

The opinion evidence abundantly supports the charge of serious probability of catastrophic effect of Ward's repeated refusal to respect the Board's directives in the numerous aforementioned disputes.

These opinions, in the form of affidavits, were made by the Undersecretary of War, the Acting War Food Administrator, the Vice-Chairman of the War Production Board, the Director of the Office of War Mobilization, the Chairman of the National War Labor Board, the Economic Stabilization Director, the Undersecretary of Navy, and many others. Mr. Davis, the Chairman of the War Labor Board, and one of the representatives of the public on said Board, stated

"The persistent refusal of the (Ward) company to settle its disputes in the manner provided for in the Board's orders will, in my opinion, unduly impede and delay the war effort for the following reasons:·

"1. It threatens the disintegration of the wartime structure of labor relations which depends upon the peaceful settlement of disputes by the * * * Board and which can not survive successful repudiation by a company of the size and economic importance of * * * Ward.

"2. It has already precipitated a strike of the company's employees in Detroit, which threatens to affect the maintenance of uninterrupted war production and the

national no-strike pledge there and elsewhere.

"3. It endangers the hold-the-line national stabilization program by rendering the government incapable of bringing about wage adjustments necessary 'to correct gross inequities or aid in the effective prosecution of the war.'

"In summary, the wartime labor policy cannot, in my opinion, continue to function effectively if large groups of workers are compelled to resort to the strike and picket line because of the refusal of their employers to accept the procedures established by the President and Congress for the peaceful adjustment of disputes. Nor can the fight against inflation be successfully administered if employees are deprived of the minimum adjustments allowable under the stabilization law."

Considering the nature of the Act, its purposes, and the background therefor, we conclude that without the aid of the definition found in the Fair Labor Standards Act, we must and do hold that the Act applies to Ward's. We would go further and say that the thousands of boys and girls who gather waste paper are engaged in production work within the meaning of this statute. Also, the thousands of bond salesmen and women engaged in selling United States War Bonds so that the proceeds may be used to pay workers and to buy material for the army, are engaged in production work. Any other conclusion would ignore the entire Congressional plan for the conduct of this war, which includes participation, sacrifices and contributions by all citizens.

The Government seriously insists that irrespective of this Act of Congress which imposed this heavy duty on the President, he had the power arising from his position as Commander in Chief of the Armed Forces to seize plants like Ward's, whenever, for any reason, it became necessary, in his judgment, so to do. This urge is argued elaborately by counsel, even more elaborately than the point on which we rest our decision. The argument presents a most important question. Active participation in its decision is intriguing. A decision thereon involves the action of other Presidents, who, in the earlier history of our country, carried the burden of conducting a war, while President. One such action, discussed by both parties, was that of President Lincoln, whose Emancipation Proclamation and his power to issue the same, are considered. President Lincoln acted without Congressional authorization.

Other questions inseparably connected with the disposition of this issue, which are both factual and legal, may be stated thus: (a) What constitutes the "theatre of actual war" in a modern war such as was the present world war in 1944 when the seizure of Ward's property occurred? (b) What are the tests and what are the facts by and from which the authorized official may find the existence of "immediate imminent and impending danger" which would warrant seizure action in 1944? (c) Who determines the existence and extent of such danger to the United States? (d) Is the finding of the Commander in Chief, if he be the official to make the findings, reviewable by any judicial body?

The Supreme Court has twice nearly answered these questions. In Home Bldg. & Loan Assn. v. Blaisdell, 290 U.S. 398, 426, 54 S.Ct. 231, 235, 78 L.Ed. 413, 88 A.L.R. 1481, Chief Justice Hughes, speaking for the Court, said:

"While emergency does not create power, emergency may furnish the occasion for the exercise of power. 'Although an emergency may not call into life a power which has never lived, nevertheless emergency may afford a reason for the exertion of a living power already enjoyed.' * * *

"The constitutional question presented in the light of an emergency is whether the power possessed embraces the particular exercise of it in response to particular conditions. *Thus, the war power of the federal government is not created by the emergency of war, but it is a power given to meet that emergency. It is a power to wage war successfully, and thus it permits the harnessing of the entire energies of the people in a supreme co-operative effort to preserve the nation.*"

Again in Ex parte Quirin, 317 U.S. 1, 26, 63 S.Ct. 2, 10, 87 L.Ed. 3, Chief Justice Stone, speaking for the Supreme Court and defining the powers of the President, said:

"The Constitution confers on the President the 'executive Power,' Art. II, § 1, cl. 1, and imposes on him the duty to 'take care that the Laws be faithfully executed.' Art. II, § 3. It makes him the Commander in Chief of the Army and Navy, Art. II, § 2, cl. 1, and empowers him to appoint and commission officers of the United States. Art. II, § 3, cl. 1.

"*The Constitution thus invests the President as Commander in Chief with the power to wage war which Congress has declared,* and to carry into effect all laws passed by Congress for the conduct of war * * *.*"

We have concluded, however, to confine our inquiry and our decision to the authority of the President and the Commander in Chief in the light of the War Labor Disputes Act. Inasmuch as the Government's position is vindicated on this ground, it would avail nothing if we should adopt an added reason for the same conclusions.

The order of the District Court is reversed with directions to enter one granting the relief sought by plaintiff.

SPARKS, Circuit Judge.

I do not agree with the majority opinion of my associates. My views are fully and correctly stated in the opinion of Judge Sullivan of the District Court. United States v. Montgomery Ward & Co., D. C., 58 F.Supp. 408.